Cynthia L. Rice (CA SBN 87630)
Laura Murchie
Disability Law United
131 Steuart Street, Suite 400
San Francisco, CA
Tel.: (303) 551-9389
Fax: (303) 551-9389

Alegría De La Cruz (CA SBN229713)
Ashly Villa-Ortega (CA SBN 355083)
Disability Rights Legal Center
700 S. Flower Street, Suite 1000 Los
Angeles, CA 90017
Tel.: (213) 736-1031
Fax: (213) 736-1428

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BAYARTULGA AVIRMED, *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY (DHS); KRISTI NOEM, in her official capacity as Secretary of the DHS; U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS); KIKA SCOTT, in her official capacity as Senior Official Performing the Duties of the Director of USCIS; CUSTOMS AND BORDER PROTECTION (CBP); PETE R. FLORES, in his official capacity as Acting Commissioner of CBP; IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE); TODD LYONS, in his official capacity as Acting Director of ICE; U.S. DEPARTMENT OF JUSTICE (DOJ); | Case No.: **'25CV1310 DMS DEB**<br><br><br>**COMPLAINT** |

and PAMELA BONDI, in her official
capacity as Attorney General


                    Defendants.


# INTRODUCTION

1. Plaintiff Bayartulga Avirmed ("Plaintiff") brings this action and seeks a Temporary Restraining Order and Preliminary Injunction preventing his immediate removal from the United States. He seeks immediate orders directing the U.S. Department of Homeland Security ("DHS"), Kristi Noem, in her official capacity as Secretary of DHS; U.S. Citizenship and Immigration Services ("USCIS"), Kika Scott, in her official capacity as Senior Official Performing the Duties of the Director of USCIS, Customs and Border Protection ("CBP"), Pete R. Flores, in his official capacity as Acting Commissioner of CBP, Immigration and Customs Enforcement ("ICE"), Todd Lyons, in his official capacity as Acting Director of ICE, U.S. Department of Justice ("DOJ"), and Pamela Bondi, in her official capacity as Attorney General (together, "Defendants") to comply with their legal obligations under Section 504 of the Rehabilitation Act ("Section 504" or "Rehabilitation Act") and the Administrative Procedures Act ("APA") to

ensure Mr. Avirmed's access to a qualified and appropriate Deaf interpreter, and counsel of his choice during immigration processes.

2. Mr. Avirmed is a 48-year-old Deaf man who cannot communicate orally and is a citizen of Mongolia, where, because of his disability, has been repeatedly subjected to life-threatening physical attacks, sanctioned or ignored by law enforcement officials. As a result of being severely beaten during one of these attacks, he suffered traumatic brain injury that adversely affected his memory, his vision, and left him with fainting spells, confusion, and seizures.

3. Mr. Avirmed is a disabled individual as defined in 29 U.S.C. § 705(20) and 6 C.F.R. § 15.3(d).  He is also a significantly disabled individual as defined in 29 U.S.C. § 705(21). He communicates with others using Mongolian Sign Language ("MSL") or reading/writing in Mongolian. He cannot understand or use American Sign Language ("ASL").

4. Because of his ongoing fear for his life, Mr. Avirmed left Mongolia. He entered the United States and was arrested by CBP agents on or about February 15, 2025, and sent to the Otay Mesa Detention Center ("OMDC") for confinement and detention. At the time of his arrest, he notified CBP agents that he was seeking asylum by handing them a letter, in English, translated from Mongolian, notifying them of his intent and his disability. It was clear that he required interpretation assistance given his disability. CBP

1    refused to read or accept the letter.

2    5. In early April 2025, the County of San Diego's Immigrant Rights Legal Defense

3    Program assigned Plaintiff *pro bono* counsel for his immigration proceedings

4    ("Immigration Counsel").

5

6    6. Despite repeated requests for appropriate interpretation assistance, Mr. Avirmed

7    has never been given the opportunity to fully and effectively present the grounds

8    for his asylum request. Defendants have been notified many times, by his

9    Immigration Counsel and his sister, that Mr. Avirmed requires an MSL

10    interpreter to effectively communicate. He suffered through interviews where

11    even the most basic information about his circumstances were completely mis-

12    interpreted—for example, identifying as his sponsor a non-existent daughter

13    named Virginia Washington, when his actual sponsor is his sister, who lives in

14    Virginia, near Washington, D.C. During fear screening processes, Mr. Avirmed

15    also requested the presence of Immigration Counsel as an accommodation, but

16    he was denied. His sponsor was also not allowed to be present at these screenings.

17    7. Mr. Avirmed, through his sister and sponsor, identified and provided contact

18    information for individuals and services who could have competently provided

19    interpretation during the fear screening process. On numerous occasions between

20    April 14, 2025, and April 28, 2025, Mr. Avirmed's Immigration Counsel

21    requested that Mr. Avirmed be afforded a credible fear interview by an asylum

officer.  Mr. Avirmed's Immigration Counsel was never notified that such an interview was to take place.  In fact, on April 16, 2025, she was advised by officials at the Asylum Office overseeing Mr. Avirmed's case that his request had never been referred to USCIS for a credible fear determination. Mr. Avirmed's Immigration Counsel followed up with several additional requests for an interview and requested that she be present. She was never advised that a credible fear interview was being conducted.

8.  Mr. Avirmed's Immigration Counsel also repeatedly invoked the protections afforded to Plaintiff under the partial judgment and permanent injunction issued in *Franco-Gonzalez v. Holder*, No. 10-cv-02211, 2013 WL 3674492 (C.D.Cal. Apr. 23, 2013).  Under that order, Plaintiff, as a disabled individual with serious mental disorder or defect rendering him incompetent to represent himself, is entitled to representation at all immigration proceedings.

9.  Despite these requests, interviews were conducted outside the presence of counsel without an MSL, and on at least one occasion, with an ASL interpreter who was unable to effectively interpret. After that interview Mr. Avirmed received a document in English, dated May 6, 2025, stating the following:

> You were interviewed by a DHS asylum officer to determine whether it is more likely than not that you will be tortured in MONGOLIA. The assessment made by the DHS asylum officer, indicated below, will be considered by DHS in determining whether you may be sent to MONGOLIA. DHS will provide you with additional information regarding how you will be processed.

Additionally, a box was checked next to the statement that "You did not

establish it is more likely than not that you will be tortured in Mongolia." The

information in this document was not communicated to Mr. Avirmed in a

language he understands, either MSL or written Mongolian.

10. As a noncitizen seeking asylum, Mr. Avirmed is entitled to the protections

afforded to him under the Immigration and Nationality Act ("INA"), which

expressly guarantees an interview by an asylum officer (8 U.S.C. §

1225(b)(1)(A)(ii)); the right to have counsel or other representative present (8

U.S.C. § 1225(b)(1)(B)(iv)) at such an interview; and that he be provided the

opportunity for a review of a negative determination by that officer (8 U.S.C. §

1225(b)(1)(B)(iii)). Defendants did not follow those procedures. Instead, Plaintiff

believes that he was processed using procedures established after Executive

Order 10888 was issued, purporting to suspend the asylum process.

11. Under guidances and directives issued to implement Executive Order 10888, Mr,

Arvirmed  as a noncitizen seeking asylum, is entitled to have the protections

afforded to him under the United States' agreement to comply with The

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment

or Punishment, and any proceedings implemented by Defendants that purport to

provide those protections, including the procedures established to implement Executive Orders.[1]

12. As a qualified individual with a disability, Mr. Avirmed is entitled to protections under Section 504, which means he cannot "be excluded from, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity" conducted by DHS. 29 U.S.C. § 794(a). Federal agencies and their components must provide reasonable accommodations to ensure persons with disabilities have meaningful access to the agency's programs and activities. *Alexander v. Choate*, 469 U.S. 287, 300-01 (1985). Defendants knowingly and intentionally denied Mr. Avirmed his right to reasonable accommodations by failing to provide him with an appropriate interpreter and/or written communication in Mongolian that were necessary to ensure he has meaningful access to the interviews done in connection with his asylum request. Additionally, Defendants knowingly and intentionally denied Mr. Avirmed's requested accommodation by not allowing his Immigration Counsel to be present during his immigration proceeedings.

---

[1] Plaintiff does not concede that the expedited removal proceedings in which he is currently moving through are lawful. However, Plaintiff is also aware that some of the issues raised in his Complaint are currently pending before the U.S. District Court for the District of Columbia, Refugee and Immigrant Center For Education and Legal Services *(RAICES), et al, v Noem, et al.,* USDC, DC, Case 1:25-cv-00306. Plaintiff is a member of the putative class pending certification in this matter, and is not seeking any determination of the merits or the likelihood of success on the merits with respect to the issues raised in the RAICES case in this application or motion.

Avirmed v. DHS, et al., Case No.
Complaint

13. Mr. Avirmed seeks an immediate Temporary Restraining Order preventing his removal, from the United States until his motion for Preliminary Injunction, after notice, can be heard.  He seeks a preliminary injunction that that requires Defendants to: 1) refrain from taking any action to deport him to his country of origin, Mongolia, or a different country until such time as he can be provided an interview to determine whether he has a credible fear of persecution or torture, and the opportunity to obtain review of any determination made based on that review; 2) provide Mr. Avirmed a MSL interpreter at all interviews and/or proceedings, formal and informal, connected with his asylum and/or CAT application, including written communication in Mongolian; and 3) allow Mr. Avirmed to be represented by and accompanied by counsel of his choosing at all interviews and proceedings related to his asylum and/or CAT request.

## JURISDICTION AND VENUE

14. This case arises under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq.; the INA, 8 U.S.C. §§ 1101 et seq., and its implementing regulations.

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. *See also* 8 U.S.C. § 1252(e)(3). Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1343. This action seeks declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202, and 29 U.S.C. § 794a.

16. Venue is proper under 28 U.S.C. § 1391(e)(1) because Plaintiff is currently housed in the Otay Mesa Detention Center located in this District, and the events or omissions giving rise to the claim occurred in this District. *See also* 8 U.S.C. § 1252(e)(3).

## PARTIES

17. Plaintiff, Bayartulga Avirmed (hereafter "Mr. Avirmed) is a Deaf adult who cannot communicate orally as well as a citizen of Mongolia who, due to his disability, has a legitimate fear of persecution and life-threatening abuse if he is returned to Mongolia. He is currently in the custody of Immigration and Customs Enforcement ("ICE"), a component of the United States Department of Homeland Security ("DHS") in the Otay Mesa Detention Center ("OMDC").

Defendant United States Department of Homeland Security ("DHS") is a cabinet-level Department of the federal government. DHS and its components, U.S. Citizenship and Immigration Services ("USCIS") Immigration and Customs Enforcement ("ICE"), and Customs and Border Protection ("CBP"),  are the agencies of the federal government principally charged with implementing and enforcing provisions of the Immigration and Nationality Act ("INA") related to the arrest, detention, and processing of asylum applications of individuals seeking admission to the United States.

18. Defendant Kristi Noem is the Secretary of DHS. Defendant Noem is sued in her official capacity. In that capacity, Defendant Noem is responsible for overseeing

enforcement and the implementation of provisions of the INA related to the arrest, detention, and processing of asylum applications of individuals seeking admission to the United States, and compliance with the applicable provisions of the Rehabilitation Act. Defendant Noem is sued in her official capacity.

19. Defendant USCIS is the DHS component responsible for conducting fear-based screenings and assessments of noncitizens who seek to access the asylum process.

20. Defendant Kika Scott is the Senior Official Performing the Duties of the Director of USCIS. Defendant Scott is sued in her official capacity.

21. Defendant CBP is the DHS component responsible for the initial processing and detention of noncitizens who are apprehended at or between U.S. ports of entry.

22. Defendant Pete R. Flores is the Acting Commissioner of CBP. Defendant Flores is sued in his official capacity.

23. Defendant ICE is the DHS component responsible for carrying out removal orders and overseeing immigration detention.

24. Defendant Todd Lyons is the Acting Director of ICE. Defendant Lyons is sued in his official capacity.

25. Defendant United States Department of Justice ("DOJ") is a cabinet-level Department of the federal government. DOJ is charged with implementing and enforcing certain provisions of the INA, including those related to the review of

credible threat determinations made asylum officers as provided in 8 U.S.C. § 1225(b)(1)(B)(iii).

26. Defendant Pamela Bondi is the Attorney General of the United States, the principal officer in charge of DOJ. She is sued in her official capacity. In that capacity, Defendant Bondi, along with Defendant Noem, is responsible for the implementation and enforcement of immigration laws and applicable provisions of the Rehabilitation Act.

## STATUTORY AND REGULATORY REQUIREMENTS AND PROTECTIONS

27. Section 504 of the Rehabilitation Act prohibits executive agencies, such as DHS and its components (USCIS, CBP, and ICE), from denying persons with disabilities the benefits of their programs and activities solely on the basis of disability. *See* 29 U.S.C. § 794 (a). They must provide reasonable accommodations, including communication access through appropriate interpretation, during all aspects of immigration processes. *See Choate* at 300-01. Section 504 imposes an affirmative obligation on those agencies to make their benefits, programs and services accessible to such persons. *Updike v. Multnomah County,* 870 F.3d 939, 949 (9th Cir. 2017). This includes the obligation to assess and identify individuals with disabilities and take steps to ensure that they have meaningful access to all aspects of the detention and removal system. *See*

*Hunsaker v. Contra Costa Cnty.*, 149 F.3d 1041, 1043 (9th Cir. 1998), citing *Alexander* at 299; *Armstrong v. Brown,* 732 F.3d 955, 958-62 (9th Cir. 2013). Upon notice of the need for an accommodation, a public entity must investigate what constitutes a reasonable accommodation of the disabled person's need for interpretation. *Updike* at 958.

28. Regulations implementing Section 504 expressly require that Defendant DHS "furnish appropriate auxiliary aids where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the Department…. [and] give primary consideration to the requests of the individual with a disability." 6 C.F.R. § 15.60.

29. Defendants have established procedures to address compliance with these obligations and issued policies, directives, guidance and plans consistent with the mandates of Section 504. *See, e.g.,* DHS Directive 065-01 Nondiscrimination for Individuals with Disabilities in DHS-Conducted Programs and Activities (Non-Employment) (Sept. 25, 2013); DHS Instruction  065-01-001 Instruction on Nondiscrimination for Individuals with Disabilities in DHS-Conducted programs and Activities (Non-Employment) (Mar. 7, 2015); USCIS  Access and Accommodations for Individuals with Disabilities: Plan for Access to USCIS Public-Facing Programs and Activities (Oct. 2018) (instructing USCIS programs to "update policies to reflect that sign language interpretation requests are not

limited to American Sign Language"); A Guide to Interacting with People Who Have Disabilities: A Resources Guide for DHS Personnel, Contractors, and Grantees from the Office of Civil Rights and Civil Liberties, available at: //www.dhs.gov/sites/default/files/2023-10/23_1026_crcl_guide_to_interacting_with_people_who_have_disabilities_508.pdf. These documents generally create and provide procedures to ensure the proper implementation of Section 504. For example, the USCIS Policy Manual states that in interviews with its officers, an individual may request an accommodation, such as an appropriate sign language interpreter, to ensure equal access to the component's benefits, services, and activities. USCIS Policy Manual, Chapter 6, Sections A-B. Similarly, ICE Directive 11071.1 Assessment and Accommodations for Detainees with Disabilities (December 15, 2016) (states that detained noncitizens with disabilities "may request and receive appropriate auxiliary aids and services, reasonable accommodations, and modifications to policies, practices, and procedures" and that these accommodations may include things that allow for "effective communication" such as interpreters or video remote interpreting services.

30. The INA was enacted by Congress to create a comprehensive statutory system allowing noncitizens fleeing persecution or torture to seek protection in the United States. Congress has given these individuals statutory rights to apply for

asylum and other protections. The Act prohibits the forced return of such individuals to places where they face persecution or torture and establishes an exclusive set of procedures for removing noncitizens from the United States and adjudicating their claims for protection. In doing all this, Congress has struck a careful balance between the interest in quickly removing those who cannot qualify for protection and the need to ensure that people are not wrongfully placed at risk of persecution or torture in another country.

31. The Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, was adopted by unanimous agreement of the United Nations General Assembly on December 10, 1984, and signed by the United States on April 18, 1988.

32. "Any [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival …), irrespective of such [noncitizen's] status," may apply for asylum. 8 U.S.C. § 1158(a)(1). Both DHS and DOJ have promulgated regulations implementing this provision. *See, e.g.*, 8 C.F.R. § 208.13 (DHS); 8 C.F.R. § 1208.13 (DOJ). To qualify for asylum, a noncitizen must show a "well-founded fear of persecution" on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Individuals with disabilities are considered to be within a particular social group which is characterized as being (1) composed

Avirmed v. DHS, et al., Case No.
Complaint

of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question. *Acevedo Granados v. Garland*, 992 F.3d 755, 761 (9th Cir. 2021).

33. In 1996, Congress established expedited removal to "substantially shorten and speed up the removal process" for certain noncitizens arriving without immigration documents. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020); *see* 8 U.S.C. § 1225(b)(1). Expedited removal by statute applies only to a limited class of noncitizens who are inadmissible because they lack valid entry documents (such as visas) or attempt to enter by fraud or misrepresentation. 8 U.S.C. § 1225(b)(1)(A); *id*. § 1182(a)(6)(C), (a)(7). Historically, these expedited removal procedures have been applied to certain noncitizens who arrive at a port of entry or are apprehended near the border after entering without inspection.

34. Even if a noncitizen is placed in expedited removal proceedings, there are specific provisions designed to safeguard access to asylum by ensuring that noncitizens are screened to determine whether they have a "credible fear" of returning to their country of origin. Specifically, if a noncitizen expresses the intention to seek asylum or a fear of removal, they are entitled to an interview with an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii). A noncitizen "who is eligible for such interview may consult with a person or persons of the [noncitizen]'s choosing prior to the interview or any review thereof." 8 U.S.C. §

1225(b)(1)(B)(iv). If the asylum officer finds that the noncitizen does not have a credible fear of persecution, the noncitizen has the right to a "prompt review by an immigration judge of a determination." 8 U.S.C. § 1225(b)(1)(B)(iii).

35. The purpose of the interview with an asylum officer is to screen fear claims. It is, in effect, a gateway to the asylum process. Noncitizens pass the screening standard if they establish a "credible fear" of returning to their country of origin, defined by statute as a "significant possibility" that the individual "could establish eligibility for asylum" in removal proceedings. *Id*. § 1225(b)(1)(A)(ii), (b)(1)(B)(v). Once the noncitizen demonstrates a credible fear—a relatively low threshold according to 142 Cong. Rec. 25,347 (1996)—they are entitled to a full removal hearing. This hearing includes both administrative and judicial review, during which they can present their asylum claim.

36. During the screening interview, the asylum officer asks the noncitizen a series of questions. The officer then uses the noncitizen's responses to determine whether they have shown a credible fear of persecution. A critical part of the screening interview process is ensuring that the noncitizen has the opportunity to fully understand and respond to the asylum officer's questions because their ability to remain in the United States—while their application for asylum is reviewed—depends on it.

37. On January 20, 2025, Proclamation 10888 was issued by the Executive Office of the President, purporting to be applicable to all noncitizens who entered the United States after 1800 hours on January 20, 2025, and purporting to restrict noncitizens entering from the southern border "…from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. 1158 ...", effectively barring access to the asylum process.

38. On or after January 31, 2025, Defendant USCIS issued its Guidance for Asylum Officers and Asylum Office Staff and circulated it to field offices with accompanying forms and operating procedures for implementing Proclamation 10888 as it related to the processing of noncitizens who entered from the southern border after January 20, 2025, and requested asylum. Therein, Defendant DHS "committed that it will not return persons that are likely to be tortured in the designated country of return or removal" and directed that noncitizens "whose entry is suspended or restricted pursuant to the EO who manifest[] fear in relation to the Convention Against Torture (CAT) will be referred to USCIS for a CAT assessment."

39. Under the operating procedures issued to implement Proclamation 10888, asylum seekers are to receive a CAT interview to determine whether there are substantial grounds for believing that the noncitizen would be subjected to torture if

removed. During this interview, the asylum officer elicits facts supporting the request for protection from the asylum seeker, who must be able to answer questions and provide detailed information. The asylum officer is required to read certain statements to the asylum seeker and verify that those statements are understood. As part of the process, the asylum office "must create a summary of the material facts as stated by the individual….[and] at the conclusion of the interview…review the summary with the individual and provide the individual with an opportunity to correct any errors." Convention Against Torture Assessment Worksheet for Alien(s) Whose Entry Has Been Suspended and/or Restricted Pursuant to INA §§ 212(f) or 215(a), Rev. 01/31/2025.

40. The Administrative Procedures Act ("APA") applies to all executive agencies and sets judicial review standards for final agency actions. 5 U.S.C. §§ 551(1), 701-706. The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions to be. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA also requires agency actions to be set aside when they are "short of statutory right" or "without observance of a procedure required by law." *Id.* § 706(2)(C), (D).

41. Additionally, where the rights of individuals are affected, the APA requires that agencies follow their own procedures. *Morton v. Ruiz*, 415 U.S. 199, 235 (1974).

"This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Id.*, *see also Church of Scientology of Cal. v. United States,* 920 F.2d 1481, 1487 (9th Cir. 1990) (noting that "an administrative agency is required to adhere to its own internal operating procedures"). The APA requires that agencies comply with their own policy statements, agency manuals, or other forms of guidance documents and internal procedures adopted without notice-and-comment. *See Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004).

## FACTUAL ALLEGATIONS

42. Mr. Bayartulga Avirmed ("Plaintiff") is a 48-year-old man from Mongolia who is Deaf and cannot communicate orally and suffered a TBI in 2020. He fled Mongolia in early 2025 because he was persecuted due to his disabilities.

43. Mr. Avirmed only speaks Mongolian Sign Language ("MSL"). He can read and write the Mongolian language but cannot read lips of the spoken Mongolian language. He does not understand American Sign Language ("ASL").

44. CBP arrested Mr. Avirmed on or about February 15, 2025, near the southern border. During his arrest and processing, Mr. Avirmed attempted to give CBP a letter translated from Mongolian into English expressing his fear of return to Mongolia on account of his disability, and intent to apply for asylum. CBP officials refused to read or accept the letter. At that time, it was apparent to CBP

officials that Mr. Avirmed was a disabled individual and unable to hear or communicate orally.

45. CBP did not provide Mr. Avirmed with an MSL interpreter at any point during his arrest, processing, or detention by CBP officials.

46. At some point in late February, CBP transferred Mr. Avirmed to Immigration & Customs Enforcement-Enforcement & Removal Operations ("ICE-ERO") for confinement at the OMDC, where he is currently detained.

47. Upon arrival at OMDC, Mr. Avirmed attempted to give authorities at OMDC the above-mentioned letter, expressing his fear of return to Mongolia and intent to apply for asylum. It is unclear if ICE-ERO ever read his letter.

48. On or about March 5, 2025, an official acting under the authority of, or at the direction of Defendants, attempted to interview Mr. Avirmed without an interpreter. Mr. Avirmed gave the official the above-mentioned letter expressing his fear of return to Mongolia and intent to apply for asylum. The official wrote the words "USA" and "Mongolia" on a piece of paper, and Mr. Avirmed attempted to use body language to communicate that he feared returning to Mongolia.

49. Mr. Avirmed's sister Bayalagmaa Avirmed, who is a U.S. citizen, began communicating with ICE-ERO and the Asylum Office about his fear interview.

She provided both offices with information that made clear her brother's need for an MSL interpreter.

50. In early April 2025, the County of San Diego's Immigrant Rights Legal Defense Program assigned Mr. Avirmed *pro bono* immigration counsel ("Immigration Counsel") for his immigration proceedings.

51. On April 16, 2025, Mr. Avirmed's Immigration Counsel emailed a Supervisory Asylum Officer and the Asylum Office of USCIS and requested that Mr. Avirmed only be interviewed in MSL and be provided necessary accommodations for his disability. She also requested that she be allowed to represent her client during his fear interview as an additional reasonable accommodation given the effects of his TBI.

52. The same day, the Asylum Office responded by email, stating that Mr. Avirmed "was not referred to USCIS for a credible fear interview" and to contact ICE or CBP with questions.

53. On April 17, 2025, Mr. Avirmed's counsel contacted the Mental Health Team of the Office of the Principal Legal Advisor ("OPLA") for San Diego. OPLA is the branch of ICE that represents the DHS in removal and custody proceedings before the immigration courts.

54. Immigration Counsel explained Mr. Avirmed's disabilities, including that fact that he can only communicate in MSL and that he had suffered a past traumatic

brain injury. Immigration Counsel suggested that Mr. Avirmed should receive safeguards and accommodations pursuant to the *Franco-Gonzalez* settlement, the INA, and Section 504.

55. Immigration Counsel also requested that OPLA use its discretion to issue Mr. Avirmed a Notice to Appear ("NTA"), the charging documents in removal proceedings, to place Mr. Avirmed in removal proceedings in immigration court.

56. An OPLA mental health team attorney responded that counsel should send the request for a discretionary NTA to ICE-ERO, and that it would "reach out to OMDC Medical to inquire [if] a Qualified Mental Health Provider has [been] found that meets the SMI criteria."

57. On April 28, 2025, Immigration Counsel sent a request for a discretionary NTA and safeguards and accommodations to ICE-ERO.

58. Immigration Counsel also filed a motion for custody redetermination with the Otay Mesa Immigration Court, the adjudicator of the Executive Office for Immigration Review ("EOIR") agency serving the OMDC. The motion included a request for safeguards and accommodations pursuant to *Franco-Gonzalez*, *Matter of M.A.M.*, 25 I&N Dec. 474 (BIA 2011) and Section 504.

59. On May 2, 2025, a hearing was scheduled on Mr. Avirmed's bond motion. However, the Immigration Judge ("IJ") determined that he lacked jurisdiction to

Avirmed v. DHS, et al., Case No.
Complaint

hear Mr. Avirmed's bond request because Mr. Avirmed had not yet been placed into removal proceedings.

60. On May 6, 2025, Mr. Avirmed was interviewed by an ASL interpreter via video. The interpreter was not using MSL. Mr. Avirmed did not understand the interpreter. The interpreter did not appear to understand Mr. Avirmed. Although it had been requested as a reasonable accommodation, Mr. Avirmed was not allowed to have Immigration Counsel present during this interview.

61. On May 8, 2025, Mr. Avirmed received a one-page document titled "Convention Against Torture Assessment Notice" with a box checked indicating that he "did not establish it is more likely than not that you will be tortured in Mongolia." The Notice was not explained to him in MSL or provided to him in written Mongolian.

62. On May 12, 2025, Mr. Avirmed's Immigration Counsel filed a stay of removal with ICE-ERO, stating that he was interviewed in the wrong language and that his rights were violated under section 504. The request for stay is pending.

63. On May 15, 2025, officials went to Mr. Avirmed's cell to take him to an interview with an ASL interpreter. Mr. Avirmed was unable to understand the interpreter, and his roommate explained that to the officials.

64. ICE officials then called his Mr. Avirmed's sister, Bayalagmaa Avirmed, and asked her to serve as an MSL interpreter. She explained that she was not

sufficiently proficient in MSL to serve as an interpreter. She again provided them with the contact information for an MSL interpreter.

65. To date, and despite repeated notifications and requests, no official within DHS or its components have ever communicated with Mr. Avirmed through an MSL interpreter or provided him with written information in Mongolian at any point during his arrest, detention and fear screening process/interview.

66. Despite repeated requests, and the need for accommodation, Mr. Avirmed has never been allowed the assistance of counsel during the interviews by asylum officials.

67. Under Defendants' current policies and procedures, because he has a negative CAT determination, and no stay has been issued, Mr. Avirmed is in danger of immediate removal to Mongolia without further notice or right of review.

## FIRST CAUSE OF ACTION
### Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

68. Plaintiff realleges and incorporates the allegation set forth in the preceding paragraphs as though fully set forth here.

69. At all times relevant to this action, Defendants are federal executive agencies, and officials thereof, within the meaning of the Rehabilitation Act. As such, they are required to comply with the provisions of Section 504, and its implementing regulations.

70. Defendants are, and were at all times relevant to this action, required to reasonably accommodate Plaintiff's disabilities, to provide him with auxiliary aids and services, and to ensure effective communication, by providing him with appropriate and effective sign language interpretation in order to ensure that he could meaningfully access and participate in all aspects of the immigration system, and in particular the fear screening process.

71. Defendants are, and were at all times relevant to this action, obligated to give primary consideration to the preferred method of communication expressed by Plaintiff, as expressed by him directly, and through his sister/sponsor and counsel of record, and to provide him with a Mongolian sign language interpreter. 6 C.F.R. § 15.60.

72. Defendants are, and were at all times relevant to this action, obligated to affirmatively identify Plaintiff as an individual with disabilities and take all steps necessary to ensure that he had meaningful access to all aspects of the immigration system.

73. Defendants failed to comply with their obligations under Section 504 and its implementing regulations when they failed to provide Plaintiff with a qualified Mongolian Sign Language interpreter, consistent with his expressed preference and demonstrated need to ensure accurate and effective communication between Plaintiff and asylum/CAT decision makers.

74. Defendants failed to comply with their obligations under Section 504 and its implementing regulations when they failed to provide Plaintiff with alternative written communication in written Mongolian.

75. Defendants failed to comply with their obligations under Section 504 and its implementing regulations when they failed to allow Plaintiff's counsel to be present during the immigration processes, including his credible fear interview.

76. As a direct and proximate result of Defendants' failure to comply with their obligations under Section 504, Plaintiff was denied participation in the asylum and CAT processes solely on the basis of his disability.

77. As a direct and proximate result of Defendants' failure to comply with their obligations under Section 504 to provide reasonable accommodations, Plaintiff was denied the equal opportunity to participate in and enjoy the benefits of the asylum and CAT processes.

78. As the direct and proximate result of Defendants' failure to comply with their obligations under Section 504, Plaintiff has suffered a denial of his rights under the INA, its implementing regulations, and the asylum and CAT policies and procedures, and is at direct and imminent risk of being deported to Mongolia, where he is likely to suffer life-threatening persecution on account of his disability; or to a third country in which he has no contacts and is extremely

unlikely to communicate in the language or have any mechanism to care for himself.

79. If this court does not grant the requested relief, Plaintiff will suffer imminent and irreparable harm based on the Defendants' ability to immediately and without further legal process remove Plaintiff from the United States.

## SECOND CAUSE OF ACTION
### Violation of the Administrative Procedures Act ("APA"),
### 5 U.S.C. § 706(2)

80. Plaintiff realleges and incorporates the allegation set forth in the preceding paragraphs as though fully set forth here.

81. The Departments of Homeland Security (and its components) are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

82. Agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" is unlawful and courts are required to set aside such action. 5 U.S.C. § 706(2)(A).

83. In failing to comply with the policies and procedures regarding disability access applicable to Plaintiff accessing the asylum and CAT processes, Defendants have prevented  Plaintiff from vindicating his right to seek asylum based on grounds of past persecution (8 U.S.C. § 1101(a)(42)), and denied his rights to an effective interview with an asylum officer (8 U.S.C. § 1225(b)(1)(A)(ii)), 42 U.S.C. § 794; 6 C.F.R. § 15.60), to have counsel or other representative present during asylum

proceedings (8 U.S.C. § 1225(b)(1)(B)(iv)), and the opportunity for a review of a negative determination by that officer (8 U.S.C. § 1225(b)(1)(B)(iii)).

84. In doing so, Defendants have acted arbitrarily and capriciously. Among other arbitrary actions and omissions, Defendants have failed to provide reasoned explanations for their actions in denying Plaintiff equal access to immigration processes, failed to consider relevant factors including a traumatic brain injury, and departed from their own internal guidance and policies.

85. As a direct and proximate cause of Defendants' violation of the APA, Plaintiff is at direct and imminent risk of being deported to Mongolia, where he is likely to suffer life-threatening persecution on account of his disability; or to a third country in which he has no contacts, is unlikely to be able to communicate in the language or have any mechanism to care for himself.

86. If this court does not grant the requested relief, Plaintiff will suffer imminent and irreparable harm based on the Defendants' ability to immediately and without further legal process remove Plaintiff from the United States.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays that the Court grant the following relief:

1. Issue an immediate Order pursuant to Rule 65 of the Federal Rules of Civil Procedure, restraining Defendants from taking any action to deport or otherwise remove Plaintiff from the United States until such

Avirmed v. DHS, et al., Case No.
Complaint

time as a hearing on Plaintiff's Motion for Preliminary Injunction may be heard;

2. Enter a Preliminary Injunction directing Defendants to

    a. Conduct an interview by an asylum officer pursuant to 8 U.S.C. § 1225(b)(1)(A)(ii) for the purpose of determining whether Plaintiff has demonstrated a credible fear of returning to his country of origin based on the fear of persecution based on his disability; and in the event that the asylum officer finds that the Plaintiff does not have a credible fear of persecution, provide Plaintiff with a prompt review by an immigration judge of a determination; or, in the alternative, to;

    b. Conduct an interview by an asylum officer consistent with the guidance, policies and procedures implementing Proclamation 10888;

    c. Make available to Plaintiff the services of a Mongolian Sign Language Interpreter and written communication in Mongolian during the asylum interview and any proceedings or processes connected thereto at which Plaintiff is required or allowed to provide information regarding his application for asylum and/or protection under CAT, including but not limited to the

interview with the asylum officer and any review of the asylum officer's determination;

    d.  As a reasonable accommodation, allow Plaintiff's counsel to be present at and participate in the asylum interview and any proceedings or processes connected thereto at which Plaintiff is required or allowed to provide information regarding his application for asylum and/or protection under CAT;

    e.  Refrain from taking any action to deport or otherwise remove Plaintiff from the United States until such time as Plaintiff has been provided an asylum officer interview, the opportunity for review of that determination if necessary, and has exhausted or had the opportunity to exhaust any other administrative or judicial reviews provided by statute or regulation.

3.  Enter judgment in favor of Plaintiff and against Defendants, finding that Plaintiff was denied effective sign language interpretation in violation of Section 504 and enjoining Defendants from failing to provide adequate interpretation in the future;

4.  Enter judgment in declaring that Defendants violated the Administrative; Procedures Act by failing to comply with their statutory and regulatory mandates, and internal policies, regarding

Avirmed v. DHS, et al., Case No.
Complaint

disability and effective communication access related to asylum and/or CAT processes and proceedings;

5. For nominal damages, or actual damages, according to proof; and

6. For an award of reasonable attorneys' fees and costs of suit.

Respectfully submitted

Dated: May 21, 2025                    Disabilty Law United

                                      By:    /s/ Cynthia L. Rice
                                             Cynthia L. Rice
                                             Laura Murchie
                                             Attorneys for the Plaintiff

                                      Disability Rights Law Center

                                      By:    /s/ Alegría De La Cruz
                                             Alegría De La Cruz
                                             Attorneys for the Plaintiff